UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

_____

UNITED STATES OF AMERICA,          )
                                   ) CASE NO. CR21-099-JCC
                  Plaintiff,       )
                                   ) Seattle, Washington
v.                                 )
                                   ) November 29, 2022
ELVIN HUNTER BGORN WILLIAMS,       ) 10:02 a.m.
                                   )
                  Defendant.       ) SENTENCING HEARING
                                   )

_____

VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE JOHN C. COUGHENOUR
UNITED STATES DISTRICT JUDGE

_____

APPEARANCES:


 For the Plaintiff:        TODD GREENBERG
                           United States Attorney's Office
                           700 Stewart Street, Suite 5220
                           Seattle, WA 98101



 For the Defendant:        MOHAMMAD HAMOUDI
                           Federal Public Defender's Office
                           1601 5th Avenue, Suite 700
                           Seattle, WA 98101



 Reported by:              NANCY L. BAUER, CCR, RPR
                           Federal Court Reporter
                           700 Stewart Street, Suite 17205
                           Seattle, WA 98101
                           nancy_bauer@wawd.uscourts.gov

PROCEEDINGS

---

THE CLERK:  The next matter is United States versus Elvin Hunter Bgorn Williams, Case No. CR21-099.

Counsel, please make your appearances for the record.

MR. GREENBERG:  Your Honor, Todd Greenberg for the United States.

THE COURT:  Mr. Greenberg.

MR. HAMOUDI:  Good morning, Your Honor.  Mohammad Hamoudi from the Federal Defender's Office.  I'm here with my colleague, Corey Endo.  I'm also here with a law student from the University of Washington, Ayla Kadah.

THE COURT:  Has your client had an opportunity to review and comment on the presentencing report?

MR. HAMOUDI:  He has, Your Honor.

THE COURT:  All right.  Do you wish to be heard?

MR. HAMOUDI:  Yes, Your Honor.  I'd like to call Mr. Mark Cunningham to the stand.

MARK DOUGLAS CUNNINGHAM,
having been first duly sworn, testified as follows:

THE CLERK:  Please state your full name for the record, and spell your last name for the record.

THE WITNESS:  Mark Douglas Cunningham, C-u-n-n-i-n-g-h-a-m.

DIRECT EXAMINATION

BY MR. HAMOUDI:

Q.    Dr. Cunningham, the court has a copy of your report and has reviewed it.  Can you just, briefly, short synopsis, tell us about your background?

A.    Certainly.

I'm a clinical and forensic psychologist in private practice, and also an independent research scientist.  My Ph.D. is from Oklahoma State University in a program accredited by the American Psychological Association as a doctoral training site in clinical psychology.

I did a one-year clinical psychology internship at the National Naval Medical Center in Bethesda, Maryland, where I was an active duty naval officer and clinical psychologist.

I was subsequently assigned as a staff psychologist at the Naval Submarine Medical Center in Groton, New London, Connecticut, where I was an active duty naval officer and staff psychologist.  Previously, at Bethesda, on my internship, I'd been a clinical psychology intern.

While at the sub base, I did two years of part-time postdoctoral study at the Yale University School of Medicine.  I was decorated for my professional contributions at the submarine base and given an award as the outstanding trainee at the program at Yale.

I left the Navy; took a full-time academic position for a couple of years in west Texas; began a practice.  At that time,

it was clinical psychology in nature, service delivery in nature, with only a little bit of forensic psychology or court-related consultations.

Over time, I did more and more forensic consultations; eventually sought board certification in forensic psychology, and also in clinical psychology. That foray -- that shift in practice into the forensic area reawakened the scientist in me, and I then began, in mid career, in my mid 40s, to extensively conduct research and publish.

The research that I was involved in involved a focus on rates and correlates of violence in prison, how often violence happens in prison and what factors are associated with it, and risk assessment, more broadly, and also on the behavior of capital offenders in prison, as I was involved in many death penalty cases around the country.

I'm licensed in 14 states. My practice is national in scope.

Q.    Okay. You've reviewed an extensive amount of records in this case, correct?

A.    I have.

THE COURT:  How did you end up at Stillwater?

THE WITNESS:  Your Honor, I applied to 15 graduate schools, and I was admitted to two. Oklahoma State was one of those; I think South Dakota was another. So extraordinarily competitive, at that time, to get into an APA-approved clinical

psychology program. And so I was there because they accepted me.

THE COURT: You know, I ruled, at one point, that it was cruel and unusual punishment to require people to live in Oklahoma.

THE WITNESS: As someone who grew up in Texas, that is a widely shared sentiment.

Q. (By Mr. Hamoudi) And you interviewed Mr. Williams, Hunter?

A. I have, by telephone, in response to the pandemic. I interviewed him on four occasions, by phone, for about eight hours in total.

Q. And you spoke to his mother as well?

A. I did. I interviewed her extensively by phone, about six hours in total, and then interacted, briefly, with her at her home as I went to pick up some records from her.

Q. Okay. In your opinion, what age was he adaptively operating at during this offense?

A. As my report reflects, I think his adaptive skill level is at a preteen level.

Q. Now, there is a contention that he comes across as an intelligent individual. Can you help us understand how somebody who operates at a preteen level can be intelligent?

A. Well, certainly.

You can have a reasonably precocious 11-year-old who is bright, hyperverbal, seems to abstract and understand, talks

about a wide range of things.

That intellectual ability, verbal ability, though, does not mean that that child is developmentally older than 11.  He's still a kid, even though he may be hyperverbal and have some ability to express himself.

Q.    And in reviewing all the records in this case, in assessing whether Hunter presented a future danger to our community, is there any evidence that you viewed that he tried to obtain a firearm?

A.    I have no knowledge of his ever attempting to obtain a firearm or to engage in any handgun-related training.

Q.    Is there any evidence that he tried to learn how to drive a truck?

A.    No.

Q.    What about studies?  Are you familiar with any studies that talk about assumptions that are made about mental illness and violence?

A.    I am.

Q.    And what is your opinion with respect to those studies?

A.    There is a well-established body of research that addresses factors that are associated with violence in the community and population studies on the extent of which mental illness may contribute to that.

Q.    And is it a true or false assumption that mental illness causes violence?

A.    Mental illness is associated with some episodes of violence.  On a population level, the overwhelming majority of violent offenses are carried out by persons that would not be classified as mentally ill.

Q.    And looking at his history and the episodic events of violence, what does your opinion tell you about him and his future?

A.    Well, in terms of risk assessment, the -- the most significant risk of violence for him is the same sort of violence that he's historically exhibited from the age of three, which is that, when frustrated, he becomes agitated, may be verbally aggressive, may lash out physically.  It's impetuous, impulsive, situational, reactive violence.  He does not have a history of instrumental violence, predatory violence, calculated violence, but rather is reactive in nature.

Q.    I want to talk to you a little bit about social support framework.

      What social support framework existed, as he was growing up, for him?

A.    Well, the strongest social support framework was that that occurred at school.  He always had an IEP, he was always in special education, in self-contained classes.  When he ventured out into mainstream classes, he, typically, had a one-on-one aide who accompanied him into those contexts.  So for a good part of the day, he had a highly structured experience at

school.

He also was continuously in mental-health care, the first consult at the age of three, and then continuously from age five. Those contacts were, at least, weekly in nature and involved both caseworkers -- you know, it involved caseworkers and counselors, as well as psychiatrists that was prescribing medication. So those services were -- constituted a significant structure.

He was part of a family, a nuclear family. That environment was stable, in terms of he was always in that family, but the resources of that family were very limited. His mother was compromised by her own psychological disorders; the biological father's absent, in prison; mom has periodic substance-related issues. And so the ability to bring effective parenting to bear for this special-needs child was limited and lacking.

Q.   And after high school, when he graduated high school, that support structure ended, correct?

A.   All the supports fell away. He was no longer receiving that intensive structuring from school. He lacked insight into his disorder; didn't view anything was wrong with him and quit his mental-health follow-up; and his mom expelled him from the home.

Q.   What kind of resources are necessary for a person like him to thrive in the community?

A.    Well, Hunter requires wraparound services to assist his effective transition into adulthood.  As I said, he's been adaptively operating as a preschool-aged child thrown out to his own devices in the community.  With the demand to function as an adult, he, predictively and catastrophically, failed.  And so he needs to return to mental-health services.  He needs significant life coaching and mentors that are actively involved, regarding employment and relationships and general life skills.  He needs a sheltered place to live, where there is an opportunity for interaction but also support.

He requires sheltered employment so that his employer is aware of the limitations that he has and that there are accommodations available.

Q.    In your research, did you identify a program in Minnesota that dealt with cases such as this?

A.    I did.  The Minnesota -- the U.S. Probation and Pretrial Services has developed, essentially, a lab, a program that's kind of a national experiment for how you deradicalize and provide services to persons who have become radicalized in some way.

At the time of a publication that the -- the diagram or chart on the screen reflects a 2018 program.  Up to that time, they had dealt with about 59 radicalized defendants, and had developed a program to address those.  And also with the leadership of the federal court there, Chief Judge John Tuneheim

and Senior Judge Michael Davis were also instrumentally involved in that, looking at what could be done, besides just incarceration, to address this radicalization problem.

Q.   I want to talk, briefly, about prison.  How will Hunter fair in the Bureau of Prisons?

A.   There is significant risk for him in prison.

Q.   And what are those risks?

A.   Well, he's mentally ill.  He's developed, mentally, like a preschooler, and so that renders him exceptionally vulnerable to be victimized.

He also puffs and talks bigger than he actually is, and that's not a characteristic that fares well in prison, as people then test you for what you say.

He is very vulnerable in his desire to feel accepted, and so there is much risk of his identifying with elements in prison that are negative influences and that give him a sense of belonging, but poorly.

There is risk that the developmental tasks that are before him, that he is already behind on in adolescence and early adulthood, that as he is taken out of the developmental mainstream and, kind of, put on ice for a period of time, that we may lose a critical period for the development of those while he is, meanwhile, being negatively impacted.

Q.   You said "development period," and I want to talk, briefly, about the optimal period in development in your 20s, and for

men, in particular.

What are the events, what I would call "milestones," in your 20s, that young men develop in their development, that's important?

A.    So this is when you are forming an identity as a productive member of the community; that you are an adult in the community mainstream.  You develop vocational skills, you begin to get early work experience, you develop romantic relationships of an increasingly committed nature.  You may begin to participate in the church life or charity work of your community.  You build a network of adult friends that are constructive in their orientation.

This is a structured building period of time where you're accumulating skills, and late adolescence and early adulthood are a critical period for that; in other words, if you do that when you're supposed to at that time, it comes easier, you establish that more successfully.  It's like you get better results when you teach a child to read at age five, six, seven, than if you wait and try to instill that ability when they're 15, 16, 17.  There is a critical period for developing that, that you -- that if you don't do it at that time, it gets harder later.

Q.    So prison will hinder that development?

A.    That's correct.

Q.    All right.

A.    You would never put a developmentally disabled and psychiatrically ill person in prison as a therapeutic experience, thinking that was going to optimize their outcomes.

MR. HAMOUDI:  No additional questions, Your Honor.

THE COURT:  Mr. Greenberg?

MR. GREENBERG:  No questions, Your Honor.

THE COURT:  Let me ask you a question.

Are you familiar with the defendant's statements of remorse for his involvement in these events?

THE WITNESS:  I am.

THE COURT:  How do you assess the credibility of those statements?  What can I look to to make a -- let me state it another way.

The number of people who develop remorse between arrest and sentencing is rather remarkable.

THE WITNESS:  Yes, sir.

THE COURT:  What can you do to help me assess the credibility of his remorse?

THE WITNESS:  So Hunter has always been remarkably transparent about his ideology and what he's thinking.  He's done that all through school.  In elementary school, he's thinking something sexually aberrant, he talks about it.

As he moved into this Islamic belief system and identification in his mid teens, he talked about it to everybody.  In spite of individuals warning him about it, in

spite of the FBI coming out to talk to him about it, he is still talking about what he thinks.

And so I think, in that sense, Hunter, kind of, can't help himself but just put out there whatever is going on.  His ability to be deceptive or to not reveal what's going on inside of him is not well developed.  And in a sense, that's a good thing, because it makes it easier for us to know where he is, because he does talk about it.

And so as Hunter talks about moving on into other interests besides Islam, becoming disenchanted with Islam, that has an authentic aspect to it.  And as he talks about becoming interested in Shintoism or other beliefs, and then begins to get tattoos like that, that increases the confidence about it.

In conversations with his mom, he talks about identifying now with the Asian-Pacific Islanders that he's in custody with, and talks about being in their par with that group.  Those discussions with his mom also seem to be unfiltered and are consistent with what I'm observing as well.

Now, the challenge here is that, whether or not Hunter does well in the community, it's not about, necessarily, his remorse or his feeling guilty.  He has become disenchanted with Islamic extremism.  I don't think that's coming back.

But Hunter doesn't know how to move forward into adulthood. And that's what got him into this trouble; that he saw no future for himself, and so then thinks about just being a martyr out

there.  So Hunter still needs help moving into adulthood that gives him some sense of, yes, there is a place for me, there are individuals I can be friends with, I can have a job, there is a girl out there who might like me someday.

So the task is to address those developmental gaps, as he was just kind of thrown out on his own resources.

THE COURT:  How do you think he will fare in the general population of a federal prison?

THE WITNESS:  I have deep concerns about that, in the same way that I would have deep concerns if you asked me how do you think an 11- or 12-year-old who weighed 160 pounds would do in federal prison.

He is vulnerable to physical assault because he gets -- he's always gotten on the nerves of his peers, and they avoided him.  And so there is risk of physical assault.  There's risk of being exploited.  There's risk of his identifying with some group to try to belong, and them using him in some way.  I'm very concerned about him in prison.

THE COURT:  Anything further?

MR. HAMOUDI:  No.

THE COURT:  All right.  You may step down.

THE WITNESS:  Thank you, sir.

THE COURT:  Mr. Hamoudi, one thing that might assist you in how you proceed further:  I intend to state for the record that I am disregarding the portions of the presentence

report to which you have objected in formulating my sentence; rather, I'm going to be looking to what the defendant has said and done, more than anything else.

MR. HAMOUDI:  I understand, Your Honor.

Your Honor, we ask that 36 months of imprisonment, followed by 15 years of supervised released be imposed in this case because, respectfully, Your Honor, anything else is not only to what Congress intended with these laws, but it would amount to a grave injustice.

Twenty years ago or so, when the September 11th tragedy occurred, our lives changed, and that day became a catalyst for at least two wars, dozens of new pieces of legislation, the creation of a new law enforcement agency, and a slew of court cases that would test the boundaries of the Constitution as we struggled to find a sense of safety in the post-911 world.

One piece of legislation, in particular, is the law at issue here, a law that is, as Former President Eisenhower would likely describe as part of the terror industrial complex.

Within that complex, the preventative prosecution was created and used in this case.  It's been used in hundreds of cases, and, unfortunately, targeted vulnerable and mentally ill persons in the United States.

And the preventive prosecution was created because the government believes Al-Qaeda still seeks to recruit and radicalize American Muslims or lone-wolf terrorists to conduct

the next major terrorist attack, and use the U.S. as a base for fundraising.

This is not such a case, Your Honor.  In this case, Hunter -- effectively, a teenager, an emotionally naive person, a mentally burdened person -- became a character in a preventative narrative.

He is a boy, and when I use that term "boy" in referring to him, I mean it.  His views when I met him, his understanding of Islam, lacked any meaningful insight.  He could not differentiate, competently, between what it meant to be a Shiite or a Sunni Muslim.  He couldn't define the term "Islam" to me, which means spiritual submission; couldn't even define the word "jihad" to me, which means a spiritual struggle.

Unfortunately, for him, is that in his what I call these chats, these statements that are particularly disturbing, I tend to see as Islamic drivel.  They make no sense, but, legitimately, people were concerned.

And what happened next was that the government wanted to see if there was any real concern.  So they put into place emotional, psychological, financial, and logistical influence to see whether he would travel overseas.

Now, the problem is that the manner in which the statute is drafted, Your Honor, makes it impossible to place that issue before a jury on a matter of guilt.  Just impossible.  But at sentencing, this court can consider it, and it ought consider

it.

It isn't right to get someone's mental-health records and education records from their parents, telling them you're going to help him, and then come here and ask for 15 years in prison.

The family had no idea.  They're here.  His mom and sister are sitting here in this courtroom.  They had no idea that doing that and providing that would result in the government asking for a 15-year sentence here today.

The government learned the most intimate details about what this boy suffered as a child.  They had him work with informants that were ten years older than him, smarter than him, act like a mentor to him, help him so that he could travel overseas.  Informants, these are strongly --

THE COURT:  Keep in mind -- and I'm not arguing with you -- it was he who went out and got his passport.  It was he who saved up the money and bought the airline ticket.  The government didn't buy that airline ticket.  It was he that went to the airport and was within minutes of boarding a plan to Egypt.  The government didn't buy that airline ticket and didn't take him to the airport.  He was the one that made those decisions.

MR. HAMOUDI:  My response -- and I have to push back here, Your Honor.

THE COURT:  That's fine.

MR. HAMOUDI:  My pushback here is that, without those

individuals, he wouldn't have been able to accomplish these objectives.  It just wouldn't have happened.  It just wouldn't have happened.

And it's clear, he was, essentially -- he was, essentially, mentored all through school.  He was moved from class to class.  There is no way -- there's just no way that he could have.

But that's just not a defense you could put on at trial.  We wouldn't have been able to establish that he was entrapped at trial, but the court has to consider that, has to consider the nature and circumstances of this sentence.

Your Honor, Jill Zahn and Jerel Thomas mentored him through his special-education program.  He was looking for people, people to accept him, and they provided him the people to do that.  Had they not introduced those persons into his life, he would not have been able to find them.

Nobody from ISIS, nobody from these extremist groups would even accept him.  He doesn't have the sophistication to find out these groups and sit there and build rapport with them and put together a three-car parade, if he had to try.

The mosque was concerned about his views, but they never viewed him as a danger.

THE COURT:  You know, I should state for the record how impressed I am with the way the mosque dealt with this situation, how they tried to help him, tried to steer him away from these radical views.  The Muslims should be very proud in

the way the mosque dealt with this situation.

MR. HAMOUDI:  Yes, and every mosque in Seattle, Your Honor, every mosque, feels particularly compelled to bring to the government's attention any time somebody harbors these views.  They have a particular responsibility to say something when they see something.  And for the Islamic community, that compulsion is unique.  It does not burden other faiths.

But Hunter is not an extremist.  He, like any autistic person, obsesses over things:  Women's rights, pro or conservative views; being transgender; sexuality; Islam; Shintoism.  He talks openly about his views with anyone, and his violent outbursts were easily and appropriately managed by the public school system.  He's always expressed remorse whenever he does something.  The school managed him to graduation, and probation can manage him through supervision.

And he overcame great odds with his diploma.  But when school ended, he lost mentors and lost the structure of public school, where his ideas were allowed to be expressed but modulated by those mentors who understood him.  Without emotional support, he didn't take his medication.

But this is clear:  He did not act violently here in the United States.  He does not have a criminal record.  No arrests. We're here today, Your Honor --

THE COURT:  If he hadn't been arrested out at SeaTac -- he was minutes away from boarding the airplane, and

but for that arrest, he would have been in Egypt, in all likelihood.

MR. HAMOUDI:  Imagine what that would be like, Your Honor.  Imagine him arriving in Cairo.  Where was he going to go?  Who was he going to talk to?  He doesn't speak Arabic.  How was he going to find his way?  Was he going to take a cab to the Sinai Desert?  Was he going to call a local?

It's just -- the reality of it is that -- is that this court has to operate under the understanding that this was a fantasy, and the reality of his capability to make decision --

THE COURT:  I'm reminded of when I was in private practice, being told by a superior court judge, who I enjoyed immensely, a guy by the name of James Mifflin, "Be very careful about telling me what I have to do."

MR. HAMOUDI:  I'll be careful.

But what I'll tell you, Your Honor, is that we're here today because of the height of the pandemic.  This happened at the height of the pandemic.

In thinking about protecting the community or deterring anyone, the likelihood that actual members of ISIS would seek out Hunter in the future, to do what the government orchestrated, is zilch.  No one who suffers from autism, Your Honor, or his mental disabilities will be deterred by this prosecution.  Not to obsess or be radicalized.  And not a single comparable case is before this court to even discuss the terms.

No such case exists.  If we were so effective in convincing him, even with his ideology, even with his desires, to try to get on a plane, imagine if we spent all those resources to try to convince him to do something better with his life.

The terrorism enhancement should not be applied, because it can't be left with an abiding conviction that this is the type of terrorist that Congress and the Sentencing Commission had in mind when they created these laws 20 years ago.  Nowhere in the statutes' text, enhancements' text, in the history or debates of these laws has this enhancement been applied to a person with autism, pervasive developmental disorder, potentially Asperger's syndrome, mood disorder, bipolar disorder, or Tourette Syndrome.

In criminal law, general intent is reserved for regulatory types of offenses, like possession of a firearm, and specific intent is reserved for sophisticated offenses, like fraud. That's the line that was drawn by Congress and the Commission.

Hunter is not sophisticated.  At best, he intended to be accepted by people who cared for him, who provided him with housing, food, subsistence, and drove him around.  It broke his heart when he learned that he was being played and discarded, like he had been played and discarded by many in his life.

I have a great deal of respect for Mr. Greenberg.  I've worked with him for over nine years on some very difficult cases and there are legitimate reasons for every governmental investigation and prosecution.  But one thing experience has

taught me is that criminal law is a moral enterprise.

And if you look at his childhood and what he has endured, if society itself were responsible for any deprivations or degradations that an individual has suffered, society's standing and ability to condemn that actor must be considered.

In my opening, I talked about justice, Your Honor.  I also want to extend a great, deep gratitude to Ms. Whaley.  Her work on this case was phenomenal.  She interviewed him twice, spoke to Dr. Cunningham, thoroughly reviewed the records, and wrote a thoughtful recommendation.

But one thing that the probation office cannot talk about is justice.  That is reserved to this court.  And part of this process is trying not only to find what justice is, but to ensure that justice is imposed in a manner that increases confidence in the outcomes.  It is a justice that protects him from the ill-informed assumption of others.

So I have to ask, where is this justice in the outcome of a child being born to a circumstance such as his?  Where is the justice that allowed this child to endure what he endured during his childhood and adolescence?  Where is the justice in he being raised in the conditions he was raised in?  Where is the justice in what happened here in the middle of a pandemic?

A sentence of seven or 15 years for a person with no criminal history is no justice, and justice abandoned him a long time ago, but he comes here, he seeks it here.  And justice is

keeping the government promise, made to his mother, that they were going to help him.  Our requested sentence reflects that promise, a promise of hope to him, which allows him the opportunity to grow through his 20s and be more than his childhood, Your Honor.  It is a childhood that fate imposed on him through no fault of his own.

THE COURT:  Does he wish to speak?

MR. HAMOUDI:  No, Your Honor.

THE COURT:  All right.  Mr. Greenberg?

MR. GREENBERG:  Thank you, Your Honor.

We're recommending a sentence of 15 years.  That's a long sentence for this defendant.  And we don't recommend that type of sentence lightly in any case, and we're certainly not doing that here today.

But Mr. Williams pledged an oath of allegiance to a terrorist organization.  He then set out and did everything he could, up until he was arrested, to support that organization through acts of violence.  His preferred course of action was to go overseas and fight on the battlefield, but he said, time and time again, in serious ways, that if he wasn't able to travel, if that didn't work out for him, for whatever reason, that he would do an attack here.  For that crime, Your Honor, we're recommending a 15-year sentence.

My remarks are going to address the three issues that I see as being most prominent before the court today.  First,

entrapment-related issues; second, the application of the terrorism enhancement; and then, lastly, the mental-health issues that the doctor testified about today, and submitted a report.

The defense appears to have abandoned what they noticed as a formal claim at sentencing, which was called "imperfect entrapment," but a lot of the remarks about entrapment, and that's fine, that's appropriate for the defense to talk about and for the court to consider.

And, perhaps, the defendant himself sums it up -- really, what I'm hearing from them -- which is that -- and this is what he told the probation office -- quote, none of this would have happened but for the informants.  That's what the defendant is putting forth to this court, and that's not credible.

The evidence before the court shows that he meant what he said.  He was going to travel, and he was planning an attack here if he couldn't travel.  He set down that path all on his own, and, midway, midstream is when he encountered the FBI's active investigation.

And the best way to show that is to look at -- and this court has alluded to this already, to some extent -- look at what the defendant had done and what had transpired before these informants got involved, because that wasn't until February of 2021.  It's a very clean line that can be drawn on the chronology.

And before that time, first of all, he had repeatedly been flagged as a risk of danger by the members of the community. And these aren't just random members of the community, and they're not people who had any kind of ax to grind or some kind of incentive to turn him in to the FBI.  His support system -- and he did have a support system -- saw the warning signs.  His school administration reported it to the FBI, his ISIS activities.  His mother, time and time again, contacted the FBI out of concern for what he was going to do.  She said, "He claimed to be a member of ISIS.  He wants to travel to fight overseas, and he talks about committing an attack here."

And then the mosque.  You're exactly right, Your Honor. They did exactly what they should have done.  They tried to get him off this path.  They gave him money, they gave him housing, food, computer, phone so he could find a job.  They gave him religious counseling.  They did everything to help him.

He used the phone and the computer to collect the ISIS videos, to communicate with other radical ISIS adherents, and they finally had to report him, because they saw him as a danger.  So they brought him to the attention of the FBI two different times; one in November of 2020, which is when they took his phone away from him and told the FBI what was on it, violent ISIS videos, beheadings, videos about making explosives, et cetera.

But then even more concerning, a few months later, in

January of 2021, the leader of that mosque came to the FBI and said, "Look, he is increasingly radicalizing.  He has told me that it is his duty to commit a violent act to get his message across, and I'm bringing this to you now out of concern."

The FBI, when they looked at the online activities of Mr. Williams -- again, looking backwards into the fall of 2020 -- it was all consistent with these reports.  He had made a video pledging allegiance to ISIS and posted it online.  He engaged in numerous privately moderated ISIS chat rooms, not with informants; with other like-minded individuals, talking about wanting to travel, talking about trying to get in touch with people so he could travel, and talking about his ideas for committing an attack here, if that's what ended up needing to be done.

Very significant is the fact that he told other people, not informants, that he was reaching out online to find those ISIS recruiters.  He told his mother that, he told the leader of the mosque that, and he told his chat-room associates that same thing.  And why that's so important is, that is how people join ISIS and travel overseas.

I don't know what Mr. Hamoudi thinks happens that is so complicated for someone to get themselves to the Sinai Desert. This is what they do.  This is why CHS-4 and CHS-5 have realistic online personas.  ISIS recruits people, like Mr. Williams, online.  He was doing the right thing.  He was on

the right track.  He didn't get the lucky break that he needed, and he didn't fall into the right contact, but he was just there for the taking, and had he got in touch with the right person, this same thing would have ensued, and he would have been arrested on the jetway of the plane going to, probably, Egypt, or somewhere else, to join ISIS.

All of that happened before informants got involved in this investigation.

And even after that -- the court has said this.  Even after that, he did the things he needed to do to make this happen.  Of course it was a sting operation, yes, but a sting operation does not equal entrapment.

He got that job.  I mean, you can't overstate this, Your Honor.  He was unemployed for months.  You can see the history of employment in the PSR.  It's spotty, at best.  As soon as he had that chance to go join ISIS, he got a job, he worked regular shifts, and he took all of his money -- he had no money -- he put all of that money into this trip.  He bought camo gear, military tactical stuff.  He bought a plane ticket.  He literally put his money where his mouth was.  You can't overstate the importance of that.

And also, the plane ticket.  He did that on his own.  I mean, we were stunned when he texted this itinerary.  Now, of course, it was heading in that direction, and it seemed like that was, ultimately, going to happen.  But he did that on his

own.  No one asked him to do that.  He jumped the gun, jumped the timing of what was, kind of, anticipated.

He got online, found out how to fly to Cairo.  It's not a very direct route.  He bought the ticket, arranged it, and sent it to the informants.  And that's important not only to show the volitional nature of the act, but Dr. Cunningham makes it sound like -- well, says, "He can't brush his teeth, he can't make his bed, he can't do anything, the guy could have never gotten himself to a terrorist group," and that's just wrong.  It's not that hard to do.  He got the plane ticket.  He figured it out all on his own.

He then made the martyrdom video.  I mean, you can't express an intent clearer than that.

And it's not like he just sat back, passively, and said, "Okay, informants, you tell me what to do, I'm going to do this, you tell me if you want me to do this."  He was berating these people.  "I want to travel sooner, can't we move this up?  I want to go to Egypt."  He was doing everything he could to push this forward himself.

Now, the court raised a very important issue, in my view as well, which is, what is the credibility of the statements that we're hearing from Mr. Williams now?

The first page of the sentencing memo says, well, he's very remorseful, he's moved away from ISIS, disavowing all of that, and they represent him as someone taking responsibility for his

actions.

I think this court should have very serious questions about the credibility of that, and the reason I say it is because the defendant is lying to this court in other contexts, and I'm going to go through some examples of that, provable lies, because he's saying none of this would have happened but for the informants. He wants you to think he was a puppet of these informants, and that's just not the case.

So a few examples: First of all, he lied to the probation office. He said, "Oh, that martyrdom video, CHS-2 kept telling me to do it and telling me to do it and pressuring me to do it. I didn't want to do it, but I finally did it, and our text messages will show that." No, there's no text message that show that. That didn't happen. That's a lie.

He made the video on his own. It doesn't take a lot to realize how damning that is today. And he lied to the probation office about that.

He, in his letter to this court, lied at least two times. First of all, he says -- well, two times he says, "Those videos that I had that indoctrinated me and radicalized me, they were," quote, "sent to me by the informants." That's absurd.

In November of 2020, when the mosque brought his phone forward and took it away from him, those videos were on the phone, four months before informants. The videos that I quote in my sentencing memo about what ISIS is telling people to do,

attacking the homeland, those were on the phone in November. He's lying to this court, trying to blame the sea of justice.

The same thing, when he says in his letter, "The informants repeatedly encouraged me to isolate myself from others, including my family, encouraging me not to be around them, making the informants my only support system."  That's ridiculous.  There's no evidence of that ever happening in this case, in the recordings, in the text messages.  And do you think, if there was, Mr. Hamoudi wouldn't be here, showing about how the informants are trying to isolating him from his other support system?  Of course he would.  That's a lie.

And then he lied to Dr. Cunningham.  Here's one example. On page 37 of the doctor's report, he wrote, "When he," Williams -- "when he would have second thoughts about jihad, CHS-2 would remind him of their duty."

He didn't have second thoughts about jihad.  The only time he ever expressed second thoughts was when he talked about blowing himself up with a suicide vest.  And there were times he said, "Yeah, that's not what I really want to do.  I'd rather just kill them, but I'll do that if I'm ordered to, if that's what they want me to do."  That's the second thought he had.

He didn't express second thoughts about having this jihad plan, and then having to be talked back into it by informants. That never happened.

And so he's not being honest with this court about his

offense conduct.  He's trying to be manipulative, in that regard, and I don't think the court should credit his other statements because of that.

Let me address the terrorism enhancement.

This court should apply that enhancement.  The evidence is clearly applicable here.  I do not think it is a close call. I'm not going to go through all the evidence.  The presentence report spends pages citing specific references --

THE COURT:  What is your reaction to Judge Breyer's conclusion that the criminal history enhancement is not warranted, but the total offense level enhancement is appropriate?

MR. GREENBERG:  Yeah, I mean, I think there's different ways to look at how to impose a fair sentence and apply the terrorism enhancement, and that's one of them.

I mean, look, we recognize, in our papers and I'll say it here today, that enhancement is extreme.  It creates a huge difference in the sentencing guidelines because of both the offense level and the criminal history, and this court can and should deviate downward from that.  The government itself is taking that position.  We're saying, look, it applies, the evidence is what it is, it's applicable, the guidelines are this, but we're recommending five years below that, and the probation office took the same approach, different recommendation but the same general approach, and we've

encouraged the court to do the same thing.

So whether it is a calculation of criminal history versus the offense level, or just a 3553 analysis, I think it is appropriate to impose a sentence less than the enhancement would say to do, but a fair review of the evidence is that the enhancement applies.

THE COURT:  That enhancement was a Sentencing Commission recommendation?

MR. GREENBERG:  Well, I assume so.  It's its own guidelines, so, yes, Your Honor.

THE COURT:  It just confirms what I've always said about people sitting around a committee table back in Washington, D.C., deciding how I should sentence somebody that I'm looking at eyeball to eyeball, in person in a courtroom. It's awfully easy to sit around a table back in D.C. and get harsh about sentencing.

MR. GREENBERG:  I'm not shocked to hear that from this court, Your Honor.

THE COURT:  I thought you were going to say you agree.

MR. GREENBERG:  Well, I probably shouldn't say anything about that.

I do want to say one last thing about the terrorism enhancement.  I'll move on, because it's a point that I wasn't able to make in the sentencing memo.  We got the report from Dr. Cunningham after that, or simultaneous to that.  It's not a

complaint.

But I found it important to note for the court, if it didn't note it itself, which is that Mr. Williams, essentially, admitted to having the intent, to support the sentencing enhancement, to Dr. Cunningham.  And I say that based on a couple of sentences here on page 39, where it says, "He," meaning Williams, "He elaborated that he does not consider himself to be an ISIS, and no longer entertains thoughts of jihad or violence for any political purpose," so, obviously, implying that he previously harbored those thoughts of jihad for a political purpose.

And the same thing in the next sentence.  He described, "No longer caring what the government is doing."  So he told Dr. Cunningham, "Yeah, I was focused on what the government was doing," which is exactly what this terrorism enhancement is about.  "I no longer feel that way."  And so it couldn't be a clearer admission to the intent required for the terrorism enhancement.

Let me address the mental-health issues, and I guess they kind of go hand in hand with the upbringing that Mr. Williams had, which, as I said in the memo, he wasn't set up for success, and that's not his fault.  He had a terrible upbringing.  He's got serious mental-health issues, and we're not trying to undermine the credibility of those issues.

The question is, you know, where does that leave this court

in terms of sentencing?  Because, as the probation office points out, it is a double-edged sword.  I mean, there is mitigation, based on the mental health.  But those same issues make this defendant uniquely dangerous.

If you look at Dr. Cunningham's report, there is a lot of reason to be concerned about future dangerousness of Hunter Williams, especially in the short term.

On page 33, he's got his mom -- talking to his mom, and she's saying, "He was out of control with anger about everything and at everybody.  Nothing was working out the way he wanted."

Page 38, he talks about bipolar disorder having a higher risk of suicide and that Mr. Williams, in particular, had suicidal ideation and had that element of it, though, that, because he couldn't picture -- and he said this today, because he couldn't picture a future, he could, at least, die heroically, die as a martyr.  That's the mind-set.

He is at risk for reactive physical and assaultive outbursts, on page 40.  And the report is full of documenting what the outbursts, or at least some of them, have been through the years, but the one that caught my attention was when he was 18 -- it's on page 12 -- where Dr. Cunningham describes him as "snapping"; that "he finally snapped in a rage that came on in an instant."

And he continues to be vulnerable, according to Dr. Cunningham, to those who offer him acceptance.  In fact,

that was what he was saying; one of his concerns in prison, like a prison gang or whatever would co-opt him into doing things because he is susceptible for that.  Those are all dangerous traits for someone to present.

And then the doctor's report goes on ad infinitum and repeats it in two different sections about how he's not capable of doing anything in his daily life.  He can't brush his teeth, he can't do chores, he can't make a bed, he can't sweep a floor, all these things, and then uses that, in my read, to draw to conclusions, trying to -- trying to lessen the extent to which this person appears dangerous.  And he says, "Well, he's just not capable of getting himself overseas to join a group, and he's totally not capable of committing any planned, lone-wolf terrorism act," whatever he means by that, and that's wrong, factually, but it also misses the point, because nobody here is accusing Hunter Williams of likely being able to mastermind some sophisticated plan, or even complicated plan.  And that's not what ISIS is asking its followers to do, either.

What ISIS is asking its followers to do is exactly what he did, or tried to do.  And these things are easy to do.  Travel overseas, all you have to do is get in touch with the right person overseas.  Now, that's not easy because they're hard to find, but that doesn't take a lot of planning and complicated thought processes.  In fact, he was right there to be had.  He just didn't get lucky.

Then all you have to do is follow their instructions, get your plane ticket, get your passport, get on the plane.

And he says, What was he going to do when he got to Egypt? He knew exactly what he was supposed to do when he got to Egypt. They told him, "This guy wearing this is going to pick you up. He's going to bring you here."  That is how people get there. It's not that hard.  He's capable of doing that.

An attack, ISIS is telling people to do the simplest of things.  Just get a gun; drive a car through a crowded street; set a fire; simple explosives that they have videos that anyone can assemble.  He had videos that anyone can assemble.

He's capable of doing any of those things, especially on a bad day when he snaps, and, as Dr. Cunningham said today, "when he gets frustrated, that's when he snaps."

And he's capable of doing it.  Anyone can go get a gun in this country, in this city, and shoot it into a crowd.  Anyone can go shoot up a Walmart or drive a car through a crowd of protesters.  He's capable of doing all those things.  It's just an exaggeration to say that he is not.

He's dangerous for the community, Your Honor.  That's the conclusion that this court should draw, notwithstanding, and, perhaps, fueled by the mental-health issue.

And so for these reasons, Your Honor, we recommend a sentence of 15 years.  We can only hope that the passage of time, the aging process, mental-health treatment that is

available in BOP, and medication that will be made available in the BOP, we can only hope that when he is done serving his sentence, he will be less dangerous.

At this point, we're asking the court to impose a 15-year term of supervised release. That will have to be as robust as possible in order to protect the community and also help Mr. Williams reenter the community at that point.

That's all I have, Your Honor.

THE COURT: All right.

MR. HAMOUDI: Just brief rebuttal, Your Honor, if I may be allowed.

THE COURT: Sure.

MR. HAMOUDI: No problem with the government taking issue with Dr. Cunningham's report. It would have been helpful for them just to cross-examine him, giving him the opportunity to explain any issues they had in the report, provide context.

But I would also add one thing, Your Honor. I take the bus sometimes from downtown, right here at Pike/Pine. There just so happens to be a lot of mentally ill people standing around on the street corner, uttering all sorts of things about violence and wanting to hurt people. And I betcha -- and I betcha -- if we got a bunch of people and a bunch of law enforcement officers to work with that individual to help materialize those fantasies, I betcha we could get them to do that.

So the reason why we're here is really about this

particular statute.  We're here because of these ideologies. And my concern is that when Congress passed these laws, they did not envision that this law would be used and applied in the manner in which it has been applied in this case.  That is our position.  That is why a sentence of seven or 15 years is just grossly disproportionate to what the justice requires.

Thank you, Your Honor.

THE COURT:  Well, I'm stating, for the record, that I adopt the reasoning of Judge Breyer in the -- I can't pronounce it.  It's A-l-h-a-g-g-a-g-i, the *United States v. Alhaggagi* case; that the application of the terror enhancement to the offense level is appropriate.  But I think the enhancement of the criminal history category to a category six, for somebody who has a criminal history category of one, is unjustified and inappropriate.

So making those adjustments, I find the total offense level to be 38 with a criminal history category of one gives a guideline of 240 to 293 months.

I'm imposing a period of confinement of 48 months and a period of supervised release of 15 years, subject to standard conditions as set forth in the probation officer's report and the special conditions set forth in the probation officer's report.

I'm imposing, as I said, a 15-year period of supervised release.  I'm waiving a fine due to the defendant's financial

condition.  He'll be required to pay the special assessment for the counts of conviction.

This sentence is a product of the guidelines, together with the factors of 18 U.S.C., Section 3553, with particular emphasis on the defendant's mental health, his history of mental-health problems.  I was very persuaded by Dr. Cunningham's testimony, and I found it quite perceptive, and it had a significant impact on the court's decision as to the appropriate sentence.

I do not criticize the government for requesting a 15-year sentence.  I understand entirely why they made that request.  If I were in their position, I might have done the same thing.  But I have different responsibilities, and I think justice in this case doesn't require 15 years.  I think it's more appropriate to impose the sentence that I have.

The sentence, as I said, is a product of guidelines and the factors of 18 U.S.C., Section 3553, with the emphasis on the factors that I mentioned.

Mr. Williams, you have waived the right to appeal the sentence, except in very limited circumstances.  If you wish to file a notice of appeal, it must be filed within 14 days of today.  If you wish the assistance of an attorney in filing a notice of appeal and cannot afford one, one will be appointed to assist you, if you so request.  If you wish the assistance of the clerk in filing the notice of appeal, she will assist you if you so request.

Do you understand, sir?

THE DEFENDANT:  I do.

MR. GREENBERG:  If I could show this to counsel?

THE COURT:  Yes.

Mr. Hamoudi, do you have a recommendation for incarceration?

MR. HAMOUDI:  Yes, Your Honor, FCI Sheridan.

THE COURT:  That's fine.

MR. HAMOUDI:  I've reviewed the judgment, Your Honor. It reflects the court's order.

MR. GREENBERG:  May I approach, Your Honor?

THE COURT:  Thank you, counsel.  We'll be in recess.

(Proceedings concluded at 11:06 a.m.)

C E R T I F I C A T E


        I, Nancy L. Bauer, CCR, RPR, Court Reporter for

the United States District Court in the Western District of

Washington at Seattle, do hereby certify that I was present in

court during the foregoing matter and reported said proceedings

stenographically.

        I further certify that thereafter, I have caused

said stenographic notes to be transcribed under my direction and

that the foregoing pages are a true and accurate transcription

to the best of my ability.



        Dated this 7th day of December 2022.



                        /S/  Nancy L. Bauer

                        Nancy L. Bauer, CCR, RPR
                        Official Court Reporter